# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW BURGHARDT, et al., | ) | CASE NOS. 5:19-cv-325 |
| | ) | 5:19-cv-2788 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| EZEKIEL RYAN, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are two dispositive motions: (1) the motion of defendant Ezekiel Ryan

("Ryan") for summary judgment (Doc. No. 65 (Ryan MSJ)); and the motion of defendant

Kristofer London ("London") for summary judgment (Doc. No. 70 (London MSJ)). Plaintiffs

Matthew Burghardt, as guardian of Matthew B. Burghardt ("Burghardt"), and Christian Beard

("Beard") (collectively referred to as "plaintiffs") have filed an omnibus response to the motions

(Doc. 76 (Opposition)), and each defendant has filed a reply. (Doc. No. 80 (London Reply); Doc.

No. 81 (Ryan Reply).)[1,2] For the reasons that follow, the motions for summary judgment are

granted.

---

[1] Plaintiffs have also filed a joint motion to strike Ex. D from Ryan's summary judgment motion. (Doc. No. 77 (Joint Motion).) Ryan opposes the motion to strike (Doc. No. 79 (Opposition)), and plaintiffs have replied. (Doc. No. 83 (Reply).) Because the Court did not rely on Ex. D—affidavits and expert report of Richard L. Stanford II, P.E. and Kurtis G. Whitling, P.E.—in ruling on the issue of qualified immunity, plaintiffs' joint motion to strike is moot.

[2] Burghardt's guardian filed suit on Burghardt's behalf on February 12, 2019. (*See* N.D. Ohio Case No. 5:19-cv-325.) Beard filed his action on November 26, 2019. (*See* N.D. Ohio Case No. 5:19-cv-2788.) The Court consolidated these related cases and instructed all future documents to be filed in Case No. 5:19-cv-325. (N.D. Ohio Case No. 5:19-cv-325, Dec. 23, 2019 Minute Order.) Accordingly, unless otherwise indicated, all docket numbers refer to the lead case—Case No. 5:19-cv-325.

## I.  BACKGROUND

In this civil rights action, plaintiffs challenge the events surrounding the February 13, 2018 shooting incident involving Burghardt and Beard and members of two local police departments. In the early morning hours of February 13, 2018, Ryan, a police officer with the Lakemore Police Department, responded to a dispatch call reporting a theft in progress at the Tractor Supply Company located in Lakemore, Ohio. (Doc. No. 60 (Deposition of Elizabeth Rittenour) at 22[3]; Doc. No. 64 (Deposition of Ezekiel Ryan) at 51.) According to employees in the store, two men set off the alarm connected to a log splitter that was located on the walkway outside the store before driving away in a dark-colored van with no license plate.[4] (Doc. No. 60 at 11–14, 16, 18–19; Doc. No. 64 at 52; Doc. No. 62 (Deposition of Kristopher[5] London) at 80.) Ryan proceeded to the plaza where the store was located, and store employees advised Ryan that the van had left the plaza. (Doc. No. 64 at 52.) Ryan began to scour the surrounding area looking for the van. (*Id*. at 52–3.)

At around the same time and in the same general area, Beard and Burghardt were riding around in a borrowed dark-colored van. Beard was driving the vehicle. (Doc. No. 63 (Deposition of Christian Beard) at 18–19.) While Beard refused to answer the question regarding whether he and Burghardt had visited the Tractor Supply Company that morning (*see* Doc. No. 63 at 18), Burghardt testified that he and Beard visited the store around 9:00 a.m. on February 12, 2018 and

---

[3] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic docketing system.

[4] The attempted theft occurred at approximately 4:30 a.m. on February 13, 2018. The store was closed to the public, but certain employees were inside resetting the seasonal section of the store to make room for the spring and summer inventory. (Doc. No. 60 at 6–7.)

[5] The complaint spells London's first name with an "f," as does London's own motion for summary judgment. In his deposition, his first name is spelled with a "ph." No one disputes the identity of this defendant; therefore, this inconsistency is immaterial.

looked at log splitters.[6] (Doc. No. 66-5 (Deposition of Matthew B. Burghardt) at 6 (17)[7].) Beard testified that he parked the van in a crescent-shaped driveway in a nearby residential area because it was a convenient place to park. (Doc. No. 63 at 19.)

The rest of the encounter was captured by an overhead surveillance camera and the body cameras of London, an officer with the Springfield Police Department, and Eric East ("Sergeant East"), London's sergeant. (These records were manually filed with the Court and will be referred to as "Surveillance Cam", "London Body Cam", and "East Body Cam", respectively.)[8]

---

[6] Upon the advice of counsel, Beard refused to answer many of the questions relating to his activities on February 13, 2018, including how he came to be in possession of a van belonging to another individual, whether he had consumed alcohol or illegal drugs prior to the shooting, and whether anyone exited the vehicle immediately after it was parked. (*See* Doc. No. 63 at 17–19; *see generally id.*)

[7] Burghardt's deposition only appears on the docket at Doc. No. 66-5. Because the format provides for four deposition pages per printed page, the first number cited represents the consecutive page number applied by the Court's electronic docketing system and the second number in parentheticals represents the page number assigned by the court reporter.

[8] Plaintiffs have also filed annotated clips from these recordings and included them as Ex. IB to their opposition brief. These annotated clips were prepared by videographer David Hess. Defendants object to the filing of these clips (Doc. No. 82 (Objections)), plaintiffs have responded to defendants' objections (Doc. No. 85 (Response to Objections)), and defendants have filed a reply. (Doc. No. 87.) Defendants complain that the clips prepared by Hess are, at best, improperly authenticated, and, at worst, misleading and represent a distortion of the events that unfolded. (Doc. No. 82 at 3-6.) For example, defendants note that one clip shows the video footage from London Body Cam with the audio from East Body Cam, suggesting that London heard everything that Sergeant East said. (*Id.* at 5.) Plaintiffs insist that the clips were taken directly from defendants' recordings, that their clips "merely complement" the video records submitted by defendants and are "simply enhancements that allow for easier viewing and analysis[.]" (Doc. No. 85 at 2–3.) Given the focus of the Court's inquiry on the issue of reasonableness "from the perceptive of a reasonable officer on the scene" and under the totality of the circumstances known to the particular officer in question, the Court questions the usefulness of the annotated clips that appear to confuse or blur the totality of the circumstances known to each defendant on scene. *See Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (In determining reasonableness of an officer's actions, the court must consider the totality of the facts from the "perspective of the hypothetical reasonable officer in the defendant's position and *with his knowledge at the time*….") (citing *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (emphasis added)). Instead, the Court's inquiry is more appropriately guided by the unmanipulated raw footage submitted by defendants, which plaintiffs also rely upon in their opposition brief, and which both sides agree are authentic and accurately depict the events in question. (*See* Doc. No. 82 at 2; Doc. No. 82-1 at 1 (email from defense counsel); Doc. No. 85 at 2.) Nevertheless, the Court has reviewed plaintiffs' edited clips and has considered them for whatever assistance they may provide in the summary judgment analysis. Accordingly, defendants' objections are overruled.

As will be seen below, these undisputed accurate depictions of the events leading up to the shooting, along with the undisputed facts determined during discovery, clearly demonstrate how Beard's reckless and dangerous behavior quickly turned what might have been a routine theft investigation into a dangerous situation, wherein defendants had only seconds to determine whether the use of deadly force was necessary to protect the officers on scene.

Before the Court gets to the videos, however, it is necessary to pause briefly to address the treatment of such evidence. The Supreme Court has addressed the role of video evidence on summary judgment. In *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007), the Court held that "[w]hen opposing parties tell two very different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." According to the Sixth Circuit:

> *Scott's* holding is twofold. First, *Scott* stands for the proposition that witness accounts seeking to contradict an unambiguous video recording do not create a triable issue. [*Scott*, 550 U.S.] at 380–81. . . . Second, *Scott* reaffirmed the holdings of *Matsushita* [*v. Elec. Indus., Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)] and *Anderson* [*v. Liberty Lobby, Inc*., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)] that, in disposing of a motion for summary judgment, a court need draw only *reasonable* inferences in favor of the nonmoving party; it need not construe the record in such a manner that is wholly unsupportable—in the view of any reasonable jury—by the video recording.

*Kinlin v. Kline*, 749 F.3d 573, 576 (6th Cir. 2014) (quotation marks and further citations omitted) (emphasis in original). So while the parties present their own, often conflicting, narratives of the encounter, the Court will consider the facts in a light most favorable to plaintiffs, while keeping in mind that it will not credit any disputed facts that clearly contradict the video footage of the parties' encounter. *See, e.g., Lewis v. Charter Twp. of Flint*, 660 F. App'x 339, 343 (6th Cir.

4

2016) (noting that "the video does not clearly show that [the suspect] 'targeted' [the officer] when he accelerated the vehicle and attempted to flee").

According to the Surveillance Cam, Beard pulled the van into the crescent-shaped driveway and parked next to the snow-covered grassy area formed by the crescent-shaped driveway and behind another parked vehicle, which was parked to the left of and next to a second vehicle in the driveway. (*See* Doc. No. 62 at 84.) Immediately thereafter, an individual is seen exiting the van and moving to the rear of the van and out of view of the camera before reemerging into view approximately 30 seconds later and returning to the passenger side of the van and getting back inside. Beard testified that, upon arriving, he and Burghardt proceeded to go to sleep in the vehicle. (Doc. No. 63 at 20.) Approximately one minute and forty seconds after Beard parked, Ryan spotted the van and pulled into the driveway behind it so as to prevent the van from moving. He parked and activated his overhead lights. (Doc. No. 64 at 53, 67.)[9] He noticed that, upon his arrival, the van's engine immediately turned off, and the extinguishment of the lights can be seen in the video. (*Id*. at 53.) While Ryan believed that the van generally matched the description of the vehicle involved in the attempted theft at the Tractor Supply Company, he noticed that the vehicle had a license plate. (*Id*.) He radioed dispatch to confirm that the van he was looking for did not have a license plate, and dispatch confirmed that it did not. (*Id*.)

Ryan exited his cruiser and walked around the van, shining his flashlight into the interior. He noticed two individuals reclining in the front seats appearing to be asleep. There is no dispute

---

[9] Beard testified that he pulled up ten minutes before Ryan arrived, and that Ryan did not activate his overhead lights. (Doc. No. 63 at 20.) Because the video clearly shows Ryan arriving within two minutes of Beard's arrival, as well as the fact that he activated his overhead lights, the Court does not credit Beard's contradictory testimony. *See Scott*, 550 U.S. at 380.

that Beard was in the driver's seat and Burghardt was in the passenger seat. Ryan testified that this behavior was a red flag because the van's engine had been on until he pulled up behind it. He believed, therefore, that the individuals were pretending to be asleep, and he considered this to be irrational behavior. (*Id*. at 53–55.) Within minutes of Ryan's arrival, London and Sergeant East arrived on the scene. London testified that he and Sergeant East reported to the scene because Ryan had not responded to dispatch's radio follow-up inquires. (Doc. No. 62 at 84.) They each parked their vehicles on the street adjacent to the driver's side of the van. London and Sergeant East exited their cruisers, and, along with Ryan, began shining their flashlights into the interior of the van and knocking on the vehicle's windows. (*See also id*. at 87–88.) From the body cams of London and Sergeant East, the officers can be seen and heard trying to make contact with the vehicle's occupants and instructing them to open the windows and doors and exit the vehicle.[10] There is no dispute that the officers did not see any weapons inside the vehicle, though there were areas of the van that the officers' flashlights could not fully illuminate. (*Id*. at 90–91; Doc. No. 64 at 64; Doc. No. 61 (Deposition of Eric East) at 26.) London walked to the rear of the vehicle and can be heard radioing dispatch to run a computer search on the van's license plate. He was advised by dispatch that the license plate was registered to a Jeep station wagon.[11] (*See* Doc. No. 62 at 149; Doc. No. 64 at 67; Doc. No. 61 at 26.) The fake license plate was another "red flag" to the officers that the van and its occupants had been involved in

---

[10] Beard testified that he did not hear the officers give any instructions or commands. (Doc. No. 63 at 20–24.) While these commands can clearly be heard on the recording from the officers' body cams, the Court acknowledges that it is possible that Beard and Burghardt did not hear them. But the question is not whether plaintiffs actually heard them but whether the reasonable officer would believe they were heard. Accordingly, the Court finds that the officers were speaking in such loud volumes that the reasonable officer would have believed that the occupants could hear the instructions and were unable or unwilling to comply.

[11] The view from London Body Cam reveals that the van was a Ford E-150, and London can be heard on the recording relaying this information to dispatch and the other officers.

criminal conduct. (*See* Doc. No. 64 at 68; *see also* Doc. No. 62 at 149; Doc. No. 61 at 46.)

Additionally, Sergeant East testified that Beard's eyes were reactive to his flashlight, providing further support for the theory that the two individuals were awake and pretending to be asleep. (Doc. No. 61 at 44–45; *see also* Doc. No. 64 at 59 [Ryan could see plaintiffs "squinting their eyes when [he] shine[d his] light in their face[s]"]; Doc. No. 62 at 151.) Because the occupants appeared to be awake, the officers believed that they were intentionally disobeying commands to exit the vehicle. (Doc. No. 61 at 45, 48.) While Beard testified that both he and Burghardt were sleeping and did not hear any commands, he admits that he could hear the officers trying to "wake them up" and gain entry into the van. (Doc. No. 63 at 20–21.) He further testified that he continued to lay in his seat and not respond to the officers because he was afraid that the officers would arrest him on outstanding warrants.[12] (*Id*. at 21–22, 25.) He subsequently decided to flee the scene. (*Id*. at 43–44, 51–52.) As such, Beard turned to Burghardt and advised him that he did not want to go back to jail and that he intended to flee to avoid arrest. (*Id*. at 43.) According to Beard, Burghardt responded, "whatever you want to do." (*Id*.)

The officers decided to gain entry to the van to check on the occupants and continue their investigation of the theft at the supply store. (Doc. No. 61 at 28.) After London determined that Ryan did not have a "slim-jim" (a long piece of metal used to unlock vehicle doors) on his person, Sergeant East retrieved one from his cruiser. (Doc. No. 61 at 28; *see* Doc. No. 64 at 79.) As he approached the driver's side front door of the van, Sergeant East can be heard on East Body Cam instructing the officers to "cover" him. (*See* Doc. No. 61 at 28; Doc. No. 64 at 79.)

---

[12] Beard testified that he was aware that there were warrants out for his arrest for parole violations. He also testified that he was surprised at how quickly the officers arrived on the scene because he had never known officers to respond to anything that quickly. He believed that the officers would arrest him on the outstanding warrants. (Doc. No. 63 at 21, 43.)

London took a position on the passenger side of the vehicle and Ryan on the driver's side; both officers drew their weapons as they covered Sergeant East. (Doc. No. 62 at 97; Doc. No. 64 at 79, 83.)

As Sergeant East began to work the slim-jim into the space between the window and the door, he can be heard on East Body Cam advising the occupants, "One more chance. Open that door. One more chance." (*See* Doc. No. 64 at 79.) As Sergeant East issues these warnings, Beard is seen in East Body Cam sitting up in his seat and raising his left hand in the air, appearing to shield his face from the light from Sergeant East's cruiser. (*See* Doc. No. 64 at 82.) Sergeant East then commands Beard to "open the door now." He tells Beard to keep his hands up where he can see them. Raising his voice even further, Sergeant East yells to Beard: "Do not start this vehicle." Beard can be seen looking directly at Sergeant East before he looks over his left shoulder. Sergeant East quickly repeats the command to "not start the vehicle," and adds "open the door" twice. Another officer can be heard echoing the command "open the door."

But, unbeknownst to the officers, as indicated previously, Beard had other plans. From London Body Cam, Beard can be seen raising his right hand toward the ignition and starting the engine, in accordance with his plan to flee the scene. As Beard starts the van, Sergeant East quickly yells, "Do not shoot him. Do not shoot him."[13] And in the next instant, the circumstances take a dangerous turn. The van's tires begin to squeal as Beard hits the accelerator and the van quickly moves backward toward Ryan's cruiser. Sergeant East immediately turns and runs away from the van toward his own vehicle. At the moment the van strikes Ryan's cruiser (or immediately prior to impact), London and Ryan each open fire on the van. It is clear from the

recordings from the officers' body cams that the tires squeal before the shots were fired. Further, Ryan is seen in the footage from the surveillance camera coming across the front of the van as he shoots and both he and London take cover to the right of the passenger side door. Sergeant East takes cover near his cruiser, which was parked on the street contiguous to the grass to the left of the van and inside the semi-circle formed by the driveway, and can be heard yelling "Whoa, whoa, whoa" immediately after the shots were fired.[14] After the crash, the officers administered first aid to plaintiffs before ambulances arrived and they were taken to the hospital.

While the shots were fired in split-second succession (as the incident unfolded in mere seconds), London fired first. (Doc. No. 62 at 111, 115; Doc. No. 64 at 89.) London testified that he saw Beard reach for his gearshift immediately before he fired his weapon, a fact that Beard contests. (Doc. No. 62 at 108; *see* Doc. No. 63 at 52.) London further testified that he fired because Ryan was in front of the van directly in its path. (Doc. No. 62 at 116; *see id*. at 122 ["I believe[d] I needed to stop the driver from running over my officers."].)[15] Ryan believes he fired after the van hit his cruiser and explained his justification for firing as such:

Q. Okay. What was the next thing you did?

A. The van smashes against my cruiser. It's facing directly at me and I had to try

---

[13] While this command can be clearly heard on East Body Cam., it cannot be heard on the recording from London Body Cam.

[14] It is clear from East Body Cam that Sergeant East yelled "Don't shoot. Don't shoot" *before* the van moved in reverse. Sergeant East confirmed this in his deposition and added that in situations such as this, where the events are rapidly unfolding, constant reassessment is required. (Doc. No. 61 at 46, 51.) He also conceded—and, again, East Body Cam confirms—that he did not see the van as it headed backwards and hit the cruiser. (*Id*. at 52–53, 55.) Nevertheless, he also testified that he was surprised that London and Ryan fired on the van and that, at the moment he was seeking cover, his "immediate concern" was not the safety of Ryan. (*Id*. at 33, 56.) Instead, his "first instinct" was to retreat. (*Id*. at 32.)

[15] London testified that he was not sure whether Sergeant East was in the vehicle's direct path but that he believed that both officers were in danger of being hit by the van. (Doc. No. 62 at 115–16.)

to make the decision of, you know, can I try to outrun this van.

Q. Okay. What did you do?

A. Well, I quickly was trying to concentrate on where I could go. I knew that Sergeant East's car was probably, roughly, 30 feet to my right, and then I had to cross the roadway. I knew that there were cars behind me to my left, and then I knew that to my far left, there was the yard and then the building. I knew that – how fast the van smacked into my cruiser, I felt like I couldn't outrun this van. Whether it was going to come straight at me or go to the right or go to the left, I didn't know what was – you know, what was the intention of the driver. I knew that I couldn't outrun the van. So I discharged my weapon while I moved to my left, which I felt was not necessarily a safe spot, but a safer spot than being in front of the van.

(Doc. No. 64 at 86–87.) Both Ryan and London admit that Beard never moved the van forward, suggesting that by firing on the vehicle they did not give Beard the chance to do so. (Doc. No. 62 at 103; Doc. No. 64 at 88.)

Beard testified that it was his intention to flee the scene traveling in reverse, and that he only struck the cruiser as a result of the force from the bullets that penetrated his body. (Doc. No. 63 at 43–44, 45.) While he concedes that he knew that one or more of the officers was in front of the van as he started the engine, he believed that he could have cleared the scene from behind. (*Id*. at 22–23, 25.) He added that when he put the vehicle in reverse, there were no officers standing behind the van. (*Id*. at 25.)

Beard was shot in his neck and left arm and hand. (Doc. No. 63 at 25.) He underwent surgery on his hand and was provided therapy to regain his hand coordination. (*Id*. at 29.) Burghardt's injuries were more serious. A bullet struck his head, his neck, and his side, as well as his right arm and foot. (Doc. No. 66-5 at 6 (19).) He suffered permanent blindness and cognitive impairment. (*Id*.) He has no memory of the events immediately prior to the shooting on February 13, 2018. (*Id*. at 5 (16).)

Burghardt brings claims against Ryan and London for excessive force and unconstitutional seizure under 42 U.S.C. § 1983 (Count 1); as well as state law claims for willful, wanton, and reckless conduct (Count 2); and assault and battery (Count 3). (Doc. No. 1 (Complaint).) Beard raises similar claims in his complaint. (Case No. 5:19-cv-2788, Doc. No. 1 (Complaint).) Defendants insist that they are entitled to summary judgment on plaintiffs' federal claim(s) because they did not violate plaintiffs' Fourth Amendment rights and that, in any event, they are entitled to qualified immunity. Defendants further posit that they are entitled to statutory immunity on plaintiffs' state law claims.

## II. STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the

lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 487 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford &*

*Co*., 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

## III. DISCUSSION

### A.     General Law on Excessive Force and Qualified Immunity

The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (citation omitted). "Qualified immunity provides police officers 'breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Stanton v. Sims*, 571 U.S. 3, 6, 134 S. Ct. 3, 187 L. Ed. 2d 341 (2013)). Qualified immunity will apply "'if officers of reasonable competence could disagree on the issue.'" *Id*. (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)); *see Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (qualified immunity will apply unless it is obvious that no reasonably competent official would have concluded that the action was lawful).

Courts employ a two-part test to determine if qualified immunity applies. First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an officer's conduct violated a constitutional right. *Ewolski*, 287 F.3d at 501; *see Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Second, if a constitutional right was violated, courts must determine "whether the violation involved a clearly established

constitutional right of which a reasonable person would have known." *Peete v. Metro. Gov't of Nashville & Davidson Cty.*, 486 F.3d 217, 219 (6th Cir. 2007) (quotation marks and citation omitted). If a plaintiff fails to establish either prong, he has failed to carry his burden, and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Since the failure of either prong is dispositive in favor of a defendant, the Court may address either prong first. *See Pearson*, 555 U.S. at 236.

It is axiomatic that a citizen has a constitutional right, secured by the Fourth Amendment, not to be subjected to excessive force during an arrest, investigatory stop, or other "seizure" of his person. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Excessive force cases are analyzed under an "objective reasonableness" standard. *Id.* at 388. Whether or not a use of force is reasonable requires balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) (quotation marks and citation omitted). Determining reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8–9); *see Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006) (citing *Dunigan*, 390 F.3d at 492) (further citation omitted). "This is an objective test, to be 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Withers v. City of Cleveland*, 640 F. App'x 416, 419 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at 396).

14

"This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citation omitted). "Further, 'the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Sigley*, 437 F.3d at 534 (quoting *Graham*, 490 U.S. at 396-97).

An officer's use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others[.]" *Garner*, 471 U.S. at 11; *see Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[A]n officer may use deadly force whenever he or she, in the face of a rapidly unfolding situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public.") (citations omitted). Ultimately, the plaintiff bears the burden of demonstrating that any force used was unjustified in order to establish a constitutional deprivation. *Miller v. Taylor*, 877 F.2d 469, 472 (6th Cir. 1989) (citations omitted).

With respect to the second inquiry, a law is clearly established if, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable officer would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, --U.S.--, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (internal quotation marks and citation omitted). "[C]ourts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Id*. at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779, 134 S. Ct. 2012, 188 L. Ed.

15

2d 1056 (2014)). "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the [conduct] 'beyond debate.'" *Id*. (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)).

### B.       Law on Deadly Force and a Fleeing Suspect

Beard concedes that his plan that morning was to flee to avoid arrest on his outstanding warrants. The Supreme Court allows for the use of deadly force against a fleeing suspect "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]"[16] *Garner*, 471 U.S. at 11. The parties have directed the Court to four cases that they believe are especially instructive and/or determinative on the use of deadly force under circumstances presented in these consolidated cases. Given that the qualified immunity analysis "depends very much on the facts of each case[,]" the Court will review the factual backgrounds of these cases before it draws any conclusions as to the reasonableness of defendants' actions. *Brosseau v. Haugen*, 543 U.S. 194, 201, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004).

First, in *Brosseau*, the officer-defendant shot the suspect-plaintiff as he attempted to flee in a vehicle he had entered after leading the officer on a foot race through a residential neighborhood. Prior to the shooting, the suspect ignored repeated commands from the officer to exit the vehicle. 543 U.S. at 196. The officer testified that she fired because she feared for the safety of other officers and private citizens in the area. *Id*. at 197. While finding questions of fact

---

[16] Because of the factually particularized nature of the qualified immunity analysis, "'[e]ach defendant's liability must be assessed individually based on his own actions.'" *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)). Nevertheless, in the present case, both Ryan and London maintain that they fired upon Beard to protect Ryan and rely upon the same facts to support their decisions. Because an officer may use deadly force against a fleeing suspect to protect himself or a fellow officer, *see Garner*, 471 U.S. at 11, the same law and analysis applies to each defendant.

precluding a finding as to whether a constitutional violation had taken place, the Supreme Court found that the officer was entitled to qualified immunity because the handful of cases on the subject did not directly address the question posed by "the situation [the officer] confronted: whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* at 200 (quotation marks and citation omitted). In so ruling, the Supreme Court relied on a prior Sixth Circuit case wherein the fleeing suspect, like the suspect-plaintiff, "'had proven he would do almost anything to avoid capture' and that the suspect-plaintiff posed a major threat to, among others, the officers at the end of the street." *Id.* (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) (noting "a car can be a deadly weapon" and holding the officer's decision to use deadly force to stop the car from possibly injuring others was reasonable)).

The following year, the Sixth Circuit addressed a police shooting involving a fleeing suspect in *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005). There, responding to a complaint of telephone harassment, the officer-defendant arrested and handcuffed the suspect-plaintiff and placed him in the back of the officer's running police cruiser. *Id.* at 769. While the officer was speaking with someone else on the scene, the suspect climbed into the front of the cruiser and took control of the vehicle. The suspect put the car in gear, and the officer shot at the vehicle as it passed by. The court affirmed the district court's decision not to resolve the issue of qualified immunity on summary judgment, noting "[i]f the facts are taken in a light most favorable to the plaintiffs, no person at the scene was ever in danger. A reasonable jury could conclude that [the officer] did not fire as the vehicle was bearing down on him in fear of his life. Instead, a jury could conclude that [the officer] fired as he ran toward the driver side of the car *after the car had*

*passed him*." *Id*. at 774 (emphasis added). In so ruling, the court distinguished cases, including *Freland*, wherein "a suspect demonstrated multiple times that he either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around." *Id*. at 775 (citing *Freland*, 954 F.2d at 343; and *Scott v. Clay Cty*., 205 F.3d 867, 872 (6th Cir. 2000) (officer did not violate the suspect's Fourth Amendment rights where, after being forced to leap out of the car's path, he fired on the car as it approached another police cruiser)).

The Sixth Circuit addressed another shooting incident involving a fleeing suspect in *Godawa v. Byrd*, 798 F.3d 457 (6th Cir. 2015). There, the officer-defendant claimed that the suspect-plaintiff targeted him with his vehicle, while the plaintiffs contended that the officer was moving toward the suspect's vehicle before he fatally shot the suspect. *Id*. at 461. Before addressing the disputed facts in the case, the court reviewed some established tenets of the governing law. First, the court observed that "[w]here a suspect is attempting to flee in a vehicle, police officers are 'justified in using deadly force against a driver who objectively appears ready to drive into an officer or bystander with his car. But, as a general matter, an officer may not use deadly force once the car moves away, leaving the officer and bystanders in a position of safety." *Id*. at 464 (quoting *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014)). The court went on to note that, "[a]n officer may . . . 'continue to fire at a fleeing vehicle even when no one is in the vehicle's direct path when the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car.'" *Id*. (quoting *Cass*, 770 F.3d at 375). Ultimately, the court ruled that the district court erred in affording the officer qualified immunity at summary judgment because the facts, viewed in the light most favorable to the plaintiff, demonstrated that,

"unlike the fleeing suspect in *Brosseau*, [the suspect] posed no discernable threat to the officers or to any other individuals at the time he was shot." *Id*. at 466.

The facts surrounding the most recent case cited by the parties were summarized by the Ninth Circuit as follows:

> After leading police officers on a high-speed chase, Monzon turned down a dead-end street. He stopped at the end of the road, and the police officers parked and exited their cruisers behind him. Monzon turned the van around, pointing it generally toward the officers. As the van accelerated in an arc toward and eventually between the officers, they commanded Monzon to stop and fired on him when the van moved in their direction and in the direction of their fellow officers. Monzon crashed into a police cruiser, pushing that cruiser into one of the officers, and the officers continued to fire. Monzon sustained multiple gunshot wounds and was pronounced dead at the scene.

*Monzon v. City of Murrieta*, 978 F.3d 1150, 1153 (9th Cir. 2020). The court found that the officers' use of deadly force was objectively reasonable "in this dynamic and urgent situation, where officers were faced with the immediate threat of significant physical harm." *Id*. at 1154. With respect to the officers who fired immediately after the suspect crashed his van into the cruiser, the court found:

> [e]ven though [Monzon's van] was no longer moving, . . . these officers could hear the engine revving and they were now situated on all sides of a van containing a driver desperate to escape—so desperate, from their perspective, that he crashed his van, first into a fencepost, and then into one of their cars. It was not unreasonable for the officers in that situation to believe that Monzon, who had just seconds before crashed the van into a fence post yet continued on, had to be stopped after this second impact before he drove the van into one of them.

*Id*. at 1158 (internal citations and quotation marks omitted).

In addition to the four preceding cases, the Court also finds illuminating the Sixth Circuit's decision in *Williams v. City of Grosse Pointe Park*, 496 F.3d 482 (6th Cir. 2007). There, officers fired at a fleeing suspect who had attempted to "reverse [his vehicle] in an

apparent effort to flee but found his egress blocked by" an officer's cruiser, before he accelerated and tried to weave his vehicle between the officers and the street curb, knocking down an officer who had attempted to reach his hand into the vehicle to stop the suspect's progress. *Id*. at 484. In affirming the district court's grant of qualified immunity, the court found:

> At the point [the officer] fired his weapon, he was faced with a difficult choice: (1) use deadly force to apprehend a suspect who had demonstrated a willingness to risk the injury of others in order to escape; or (2) allow [the suspect] to flee, give chase, and take the chance that [the suspect] would further injure [the officer who was knocked down] or an innocent civilian in his efforts to avoid capture. Moreover, [the officer] had only an instant in which to settle on a course of action. Under the circumstances, we cannot say that [the officer] acted unreasonably, nor do we believe that a rational juror could conclude otherwise.

*Id*. at 486.

Of course, the present case has factual differences that distinguishes it from each of the cases above. *See Brosseau*, 543 U.S. at 201 ("this area is one in which the result depends very much on the facts of each case"). Nevertheless, they provide a foundation for evaluating the parties' perspectives on the specific facts surrounding defendants' use of force.

### *Defendants' Position*

As to the first prong of the qualified immunity analysis, defendants argue that each of the three factors identified in *Graham*—severity of the crime, the immediate threat to safety of the officers, and whether the suspect is actively resisting arrest or attempting to evade arrest—supports a finding that their use of force was objectively reasonable. Specifically, they note that Beard concedes, and the officers' body cams bear this out, that when Beard turned on the engine and rapidly accelerated in reverse, he was attempting to flee from law enforcement—a dangerous

felony offense.[17] (Doc. No. 80 at 4.) As to the second and third factors, defendants argue that, even before Beard attempted to flee in a reckless manner, the attendant circumstances placed the officers in a "raised" level of alertness to potential violence and danger. In particular, defendants highlight the fact that plaintiffs appeared to be pretending to be asleep, had a fake license plate on the van, appeared to be ignoring direct orders from the officers, and the officers could not see plaintiffs' hands or all areas of the van to rule out the existence of weapons. (Doc. No. 81 at 2.) They also underscore the fact that they did not shoot until after Beard squealed his tires and careened toward Ryan's cruiser. They further emphasize that Ryan was standing directly in front of the van, essentially blocking Beard's only possible path forward. (*Id*. at 5.) Ultimately, they insist that Ryan and London had the right to use deadly force to stop Beard's attempts to flee to protect Ryan from the immediate threat of significant physical harm.

> *Plaintiffs' Position*

Plaintiffs focus on the fact that defendants were investigating a non-violent property offense on the night in question, and that even an illumination of the inside of the van did not reveal the existence of weapons. (Doc. No. 76 at 10–11.) They observe that the situation leading up to the shooting was calm—the officers took their time and did not appear from the body cams to be rushed as they surveyed the scene including the van and its occupants. (*Id*. at 12–13, 17.) According to plaintiffs, Beard never did anything to pose a threat to any officers, a fact they believe is illustrated by Sergeant East's instructions to the other officers, "Don't shoot. Don't shoot" and his subsequent surprise that shots had been fired. (*Id*. at 18.) Plaintiffs also rely

---

[17] Additionally, while the underlying property offense did not involve violence, Ryan testified that he "had a feeling" that it might have risen to the level of a felony because the value of the log splitter was likely over $1,000.00. (Doc. No. 64 at 62.) London testified that he knew it was at least a possibility that the attempted theft they were investigating was a felony. (Doc. No. 62 at 148.)

heavily upon the fact that Beard never put the van in drive because his plan was to escape by driving in reverse, away from the officers. As to this last point, they observe that there are factual disputes relating to the reason the van hit the cruiser making summary judgment inappropriate. (*Id*. at 17, 28.)

### C.     Analysis and Conclusion on Fourth Amendment Violation

Viewing the evidence in a light most favorable to plaintiffs, there are certainly disputed facts: whether Beard reached for the gear shift before the officers fired, whether plaintiffs reacted to the officers' flash lights, whether plaintiffs heard and disobeyed the officers' instructions, whether the force of the bullets caused Beard to hit Ryan's cruiser, and whether Beard intended to drive forward in the direction of Ryan. But the mere existence of some factual disputes will not frustrate an otherwise proper summary judgment motion. *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (citing *Anderson*, 477 U.S. at 247–48) (quotation marks omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (citation omitted).

Applying these principles to the question of qualified immunity, "the Court's task is to 'determine[] the relevant set of facts' by 'draw[ing] all inferences in favor of the nonmoving party *to the extent supportable by the record*,' at which point the Court must determine reasonableness as a matter of law." *Bushrod v. Dist. of Columbia*, No. 1:18-cv-2462, 2021 WL 673906, at *12 (D.D.C. Feb. 22, 2021) (quoting *Scott*, 550 U.S. at 381 n.8) (emphasis supplied in

*Scott*)).[18] "Assessing the 'reasonableness' of the shooting requires examining 'the perspective of a reasonable officer on the scene.'" *Id*. at *13 (quoting *Graham*, 490 U.S. at 396). "So the Court will—after making all supportable inferences in [plaintiffs'] favor—determine the relevant set of facts, with a focus on what a reasonable officer in [London's and Ryan's] position would have experienced." *Id*.

The Court begins with the undisputed facts the officers knew as they approached the van. They knew it fit the description of a van that was recently involved in an attempted theft, and they knew it had a fake license plate. And Ryan, at least, knew that the van's engine shut off immediately after he arrived on scene, a fact that he shared with London and lent support for the officers' suspicion that plaintiffs were pretending to be asleep. (*See* Doc. No. 62 at 89; Doc. No. 64 at 59.) While Beard testified that he did not hear any instructions or notice the officers' lights, he conceded that he knew that the officers were trying to wake him up and that he intentionally did not respond because he did not want to be arrested. Additionally, from East Body Cam, Beard can be seen looking directly at Sergeant East and then looking behind him as Sergeant East yelled not to start the engine. Given that the officers were knocking on the windows and loudly yelling instructions, as is evident from the officers' body cams, a reasonable officer would assume that the vehicle's occupants heard these commands and were choosing to disobey them.

Two other critical undisputed facts require emphasis. First, it is undisputed that Beard intended to flee, and he made his intentions known to the officers when he rapidly accelerated in

---

[18] The Supreme Court has underscored the importance of making the qualified immunity determination as early as possible. *Pearson*, 555 U.S. at 232 (noting that qualified immunity is "an immunity from suit rather than a mere defense to liability, [so] it is effectively lost if a case is erroneously permitted to go to trial") (quotation marks and citation omitted).

reverse and squealed his tires; and second, Ryan was standing in front of the van when Beard did so. Even before the van hit the cruiser, Beard demonstrated that he was willing to engage in dangerous felony level behavior—fleeing authorities—to leave the scene. *Monzon*, 978 F.3d at 1158. "While the suspected crime was a nonviolent property offense, the immediate threat" Beard posed when he decided to drive recklessly "and the fact that [he] elected to flee both suggest that [the officers'] chosen use of force to apprehend [Beard] was reasonable." *Williams*, 496 F.3d at 487; *see, e.g., Bushrod*, 2021 WL 673906, at *14 (noting that, even though officers pulled Bushrod over because his car lacked registration, his decision to flee elevated the level of his misconduct).

Like the officer in *Williams*, London and Beard had only an instant to decide whether Beard would likely try to move forward if he found his path blocked from behind. *See Williams*, 496 F.3d at 486, 487 (The officer "had no way of knowing whether [the suspect] might reverse" direction and drive at the other officers or pedestrians in the area). While Beard subjectively intended only to leave in reverse and believed that he could successfully maneuver the van in such a way that it would miss hitting Ryan's cruiser, his intentions were unknown to London and Ryan. *See id*. at 487 ("That [the suspect] may not have *intended* to injure [an officer on scene] or anyone else is immaterial. From [the shooting officer's] viewpoint, [the suspect] was a danger, and he acted accordingly.") (emphasis is original); *see also Cass*, 770 F.3d at 375 ("[T]he critical question is typically whether the officer has reason to believe that the [fleeing] car presents imminent danger to officers . . . in the area.") (quotation marks and citation omitted). What they did know was that Beard had demonstrated that he was "desperate to escape," the way backward was—at the very least—partially blocked, and Ryan was standing in front of the only way

forward. *See Monzon*, 978 F.3d at 1158 (quotation marks and citation omitted).

Under these circumstances, the officers were not required to wait until it was too late for Ryan to safely retreat to act. *Bushrod*, 2021 WL 673906, at *15 ("Behind the wheel of a powerful sedan, Bushrod threatened the safety of officers and innocent bystanders, giving a reasonable officer a compelling reason to end the encounter. After all, 'the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.'") (quoting *Wallace v. Dist. Columbia*, 685 F. Supp. 2d 104, 111 (D.D.C. 2010) and citing *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) (concluding that stationary car posed deadly threat) and *Brosseau*, 543 U.S. at 200 (acknowledging that "a car can be a deadly weapon")); *see also Plumhoff,* 572 U.S. at 777 ("Under the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that [the suspect] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road."); *Jordan v. Howard*, 987 F.3d 537, 543–44 (6th Cir. 2021) (noting an officer "need not wait for [the] suspect to open fire on him . . . before the officer may fire back.") (quotation marks and citation omitted). Consequently, it matters not that the van ultimately never moved forward. *See Cass*, 770 F.3d at 375 ("An officer is justified in using deadly force against 'a driver who *objectively appears ready to drive into an officer* or bystander with his car.") (emphasis added) (citations omitted).

The fact that Sergeant East instructed London and Ryan not to shoot also does not change the calculus. It is evident from East Body Cam that Sergeant East issued this command *before* the tires squealed and the van accelerated backward. (*See* Doc. No. 61 at 50–51.) This was a rapidly evolving event, and whatever tranquility may have been present on scene before Beard

chose to flee evaporated in an instant. *See Mullins*, 805 F.3d at 766 ("Thus, in analyzing the reasonableness of [the officer's] use of force, we must look at [the suspect's] behavior immediately prior to the moment he was shot.") Further, Sergeant East conceded that, as he retreated, he lost sight of the van's location and the direction it was facing, so he was without critical information necessary to assess the danger to Ryan. (Doc. No. 61 at 52–55.) Finally, even if Sergeant East's initial instinct was to retreat—instead of stopping the threat by firing—this does not make the actions of London and Ryan unreasonable. The reasonableness standard asks whether *a* reasonable officer would have thought his actions were reasonable, not whether *every* reasonable officer would. Qualified immunity will apply "'if officers of reasonable competence could disagree on the issue.'" *Mullins*, 805 F.3d at 765 (quoting *Malley*, 475 U.S. at 341) (qualified immunity will apply unless it is obvious that no reasonably competent official would have concluded that the action was lawful).

Nor will the Court engage in the type of armchair quarterbacking that the Supreme Court prohibits in evaluating the actions of police officers. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *see Freland*, 954 F.2d at 347 ("What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.") "It is not for the court to substitute its own personal notion of the appropriate procedure for those decisions made by police officers in the face of rapidly changing circumstances." *Williams*, 496 F.3d at 486 (citing *Freland*, 954 F.2d at 347).

Ultimately, the Court agrees with defendants that, based upon the undisputed facts, each of the factors identified in *Graham* supports the conclusion that defendants' use of force was objectively reasonable.[19] For all of the reasons set forth above, and taking into consideration the totality of the circumstances, the Court concludes that a reasonable officer would find it necessary to use deadly force to protect Ryan from the serious threat of physical harm posed by Beard's actions. *Garner*, 471 U.S. at 11. There was, therefore, no Fourth Amendment violation, and London and Ryan are entitled to summary judgment on plaintiffs' § 1983 claim.

### D.    Clearly Established Rights

Because the Court has determined that the use of force was objectively reasonable, it is not required to reach the question of whether plaintiffs' rights were clearly established at the time of the shooting. *See Pearson*, 555 U.S. at 236. However, even if plaintiffs had established the existence of a constitutional violation, qualified immunity would protect defendants because the rights at issue herein were not clearly established.

---

[19] Plaintiffs attempt to generate a question of fact by offering the expert opinion of Roger Clark, who opined that neither Ryan nor London were in imminent danger of harm during the incident, and that in discharging their weapons, these officers violated generally accepted policing practices and Ohio Peace Officer training Commission standards. (Doc. No. 76 at 18-19, citing Doc. No. 76-5 (Expert Report of Roger Clark) at 21–23.) The first question in the qualified immunity analysis asks whether an officer violated a constitutional right, not whether he violated administrative policies or practices. *See Freland*, 954 F.2d at 347–48 (noting that "the fact that Officer Schulcz's actions may have violated Springdale's policies regarding police use of force does not require a different result"); *see Ford v. Childers*, 855 F.2d 127 (7th Cir. 1992) (rejecting expert opinion that the officer's actions had violated the police manual and generally accepted police practices, focusing, instead, on whether the officer's actions violated the suspect's constitutional rights and citing *Garner*, *supra*.) (approach cited with favor by *Freland*); *but see Latits*, 878 F.3d at 552 ("although police procedures do not set the bounds of the Fourth Amendment, we consider it relevant that Officer Phillips repeatedly violated police procedures in both ramming Latits and running up to his car"). Further, the Court is not bound by Clark's legal conclusions on reasonableness, nor do they create questions of fact. *See Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017) (on summary judgment, district court did not err in ignoring expert's legal conclusions on objective reasonableness).

It is true that the general/abstract right to be free from excessive force is well established. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) (citing *Neague v. Cynkar*, 248 F.3d 504, 507 (6th Cir. 2001)). Nevertheless, the Court observes that plaintiffs fail to identify any controlling caselaw from the Sixth Circuit or the Supreme Court, or even persuasive authority from other jurisdictions, that would support a finding that defendants were on notice that the alleged unlawfulness of their conduct in the mandated "particularized sense" was apparent. While this case did not involve a high-speed car chase or even a car moving forward as in *Brosseau* and *Williams*, it also did not involve a situation wherein the vehicle in question had already cleared the scene as in *Godawa* and *Cupp*. Instead, it arguably falls into the "'hazy border between excessive and acceptable force.'" *Brosseau*, 543 U.S. at 201 (quoting *Saucie*r, 553 U.S. at 206). "The cases by no means 'clearly establish' that [defendants'] conduct violated the Fourth Amendment." *Id*. Under these circumstances, defendants would be entitled to qualified immunity on the federal claims.

## E.     State Law Claims and Statutory Immunity

Ohio Rev. Code § 2744 provides immunity for state law tort actions for employees of political subdivisions, provided their acts and omissions were not "manifestly outside the scope of the employee's employment or official responsibilities" or were taken "with malicious purpose, in bad faith, or in a wanton or reckless manner[.]" Ohio Rev. Code § 2744.03(A)(6)(b). "Malice" is the "willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified." *Otero v. Wood*, 316 F. Supp. 2d 612, 629 (S.D. Ohio 2004) (citations omitted). "Bad faith" includes a "dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id*. "Wanton misconduct"

is defined as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012) (citation omitted). "Reckless conduct" is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id*.

Based on the same analysis presented above with respect to federal qualified immunity, the Court concludes that there are no genuine issues of material fact and that defendants are entitled to immunity from liability in connection with plaintiffs' state law claims. In the same way in which plaintiffs failed to demonstrate that the officers' actions were objectively unreasonable, plaintiffs have also failed to show that the officers acted with "malicious purpose, in bad faith, or in a wanton or reckless manner." *Chappell*, 585 F.3d at 916 n.3 (holding that failure to prove objective unreasonableness to avoid qualified immunity under 42 U.S.C. § 1983 also defeated claim for qualified immunity under Ohio law); *see Pollard*, 780 F.3d at 404 ("If the officers were objectively reasonable in shooting Bynum, it logically follows that they could not have been reckless in shooting Bynum"); *Mullins*, 805 F.3d at 769 ("Because we find that [the officer's] use of deadly force was not objectively unreasonable under the circumstances, it follows that he did not act with 'malicious purpose, in bad faith, or in a wanton or reckless manner,' as required to avoid statutory immunity under Ohio law.") (quoting Ohio Rev. Code § 2744.03(A)(6)(b)).

**IV. CONCLUSION**

For the foregoing reasons, defendants' motions for summary judgment (Doc. Nos. 65, 70) are granted. These consolidated cases are dismissed.

Dated: September 17, 2021

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**